*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| GREGORY KISLING, | ) | |
| | ) | Supreme Court Nos. S-18699/18709 |
| Appellant and | ) | (Consolidated) |
| Cross-Appellee, | ) | |
| v. | ) | Superior Court No. 3AN-19-07293 CI |
| | ) | |
| PAUL GROSZ, | ) | O P I N I O N |
| | ) | |
| Appellee and | ) | No. 7754 – March 14, 2025 |
| Cross-Appellant. | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Josie Garton, Judge.

Appearances: Alfred Clayton, Jr., Clayton & Diemer, LLC, Anchorage, for Appellant and Cross-Appellee. Jeffrey J. Barber, Barber & Associates, LLC, Anchorage, for Appellee and Cross-Appellant.

Before: Maassen, Chief Justice, and Borghesan, Henderson, and Pate, Justices. [Carney, Justice, not participating.]

MAASSEN, Chief Justice.

I.      INTRODUCTION

        A jury in a personal injury case found that the plaintiff had suffered $1.2 million in noneconomic damages but also that the defendant was only 25% at fault for the injuries; the remaining 75% was the plaintiff's own comparative fault. On post-trial motions the superior court first applied the comparative fault percentages to find that

the defendant owed $300,000 (25% of $1.2 million), then turned to the statutory damages caps of AS 09.17.010(b), which in the circumstances of this case limited recovery of noneconomic damages to $400,000.  Because the amount awarded to the plaintiff was under the statutory cap, the court did not reduce it further.

On appeal, the defendant contends that the sequence should have been reversed; that is, that the superior court should first have reduced the noneconomic damages to the $400,000 cap, then applied the comparative fault percentages to that capped amount, for an award to the plaintiff of $100,000 (25% of $400,000).

Considering the statutory language, legislative history, policy, and precedent, we are persuaded that the superior court's decision was correct.  It properly respected both the jury's role as fact finder — deciding the actual loss — and the legislative policy choice to cap the defendant's exposure at a certain amount regardless of that actual loss.  We conclude that a court must first allocate fault before deciding whether a damages cap applies; if the allocation of fault results in an award below the statutory cap, the law requires no further reduction.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Paul Grosz was injured while helping his friend Gregory Kisling hang a crucifix on the wall above a staircase in Kisling's home.  Grosz was standing on a "walking plank," or homemade scaffolding, when the wire holding the crucifix broke, and both Grosz and the artwork fell to the ground.  Grosz's injuries included broken ribs, a spinal fracture, and a traumatic brain injury.

### B.    Proceedings

Grosz sued Kisling for negligence.  Trial resulted in a jury verdict of $1.2 million for past and future noneconomic loss, twice what Grosz had asked for.  The jury also found, however, that Kisling was only 25% at fault for the accident; the jury allocated the other 75% of fault to Grosz himself.

After the verdict was read, Grosz asked the superior court to allow another question to be submitted to the jury: whether his injuries amounted to "severe permanent physical impairment or severe disfigurement" justifying application of the higher of two statutory caps on noneconomic damages.[1] The court rejected the request and said it would "address [the issue] in a post-verdict motion."

### 1. Relevant statutory framework

Allocation of fault in personal injury cases and noneconomic damages caps are addressed in statute. Alaska Statute 09.17.010(a) provides that "[i]n an action to recover damages for personal injury or wrongful death, all damage claims for noneconomic losses shall be limited to compensation for pain, suffering, inconvenience, physical impairment, disfigurement, loss of enjoyment of life, loss of consortium, and other nonpecuniary damage." Subsection (b) of the statute places a cap on those kinds of damages: "[T]he damages awarded by a court or a jury under (a) of this section for all claims, including a loss of consortium claim, arising out of a single injury or death may not exceed $400,000 or the injured person's life expectancy in years multiplied by $8,000, whichever is greater." And subsection (c) of the same statute provides a higher cap for cases "when the damages are awarded for severe permanent physical impairment or severe disfigurement": "$1,000,000 or the person's life expectancy in years multiplied by $25,000, whichever is greater."[2]

Other statutes address the allocation of fault among parties. Alaska Statute 09.17.060 provides that the "contributory fault chargeable to the claimant diminishes proportionately the amount awarded as compensatory damages for the injury attributable to the claimant's contributory fault, but does not bar recovery." Alaska Statute 09.17.080(a) provides that when more than one person is found to be at

---

[1]    *See* AS 09.17.010(b)-(c).

[2]    AS 09.17.010(c).

fault, the fact finder must indicate "(1) the amount of damages each claimant would be entitled to recover if contributory fault is disregarded; and (2) the percentage of the total fault that is allocated to each claimant, defendant, . . . or other person responsible for the damages." Subsection (c) of the same statute requires the court to "determine the award of damages to each claimant in accordance with the findings and enter judgment against each party liable," while also indicating "in the judgment each party's equitable share of the obligation to each claimant in accordance with the respective percentages of fault as determined under (a) of this section."

### 2. Post-trial dispute over which comes first: allocation of fault or application of damages caps

The parties filed post-trial memoranda disputing the application of damages caps to Grosz's recovery. Kisling argued that the court should first apply the cap of AS 09.17.010(b) to reduce the jury's $1.2 million verdict to $400,000, and only then apply the apportionment-of-fault percentages as required by AS 09.17.080; this would result in a recovery for Grosz of $100,000, 25% of $400,000. Grosz, on the other hand, argued that the higher $1,000,000 cap of AS 09.17.010(c) should apply because the jury had heard "substantial evidence that [his] symptoms are severe and permanent." As for sequencing, Grosz argued that the court should first apply the apportionment percentages before deciding whether any cap should apply; this would result in a recovery for Grosz of $300,000 — 25% of $1.2 million — which is below the lower $400,000 damages cap and therefore not subject to any further reduction.

### 3. Superior court order

The superior court decided, first, that the relevant noneconomic damages cap was the $400,000 cap of AS 09.17.010(b) rather than the $1,000,000 cap of subsection (c). The court observed that Grosz, in seeking application of the higher cap, was asking "the court to make a factual finding that he suffered severe and permanent physical impairment," which was instead "an issue for the jury." The court concluded

that "[b]ecause [Grosz] did not move for a directed verdict, or otherwise raise the issue until after the jury returned its verdict, the issue was not properly raised or preserved."

The court then addressed the issue of sequencing, "a question of pure law" that "require[d] the court to interpret and construe AS 09.17.010, AS 09.17.060 and AS 09.17.080." The court decided that the statutory scheme was best accommodated by looking first to the amount of damages allocated to each party at fault and only then deciding whether a cap should apply. Because Kisling had been found 25% at fault — for $300,000 of the $1.2 million verdict — the award of damages was under the $400,000 cap and did not need to be reduced. Kisling filed a motion for reconsideration, which was denied.

Kisling then filed this appeal. Grosz cross-appealed, contending that if Kisling's sequencing was correct, the superior court erred by applying the lower, $400,000 cap without first resolving the question whether he suffered the "severe permanent physical impairment or severe disfigurement" that would trigger application of the higher, $1,000,000 cap,[3] either by submitting the question to the jury post-verdict or by making its own finding of severity based on the evidence. Because our resolution of Kisling's appeal does not trigger the application of any damages cap, we do not need to reach Grosz's cross-appeal.

## III. STANDARD OF REVIEW

Statutory interpretation presents questions of law that we review de novo.[4] "In conducting de novo review, we will 'adopt the rule of law that is most persuasive in light of precedent, reason, and policy.' "[5]

---

[3]     AS 09.17.010(c).

[4]     *E.g.*, *Rosauer v. Manos*, 440 P.3d 145, 147 (Alaska 2019) (quoting *Madonna v. Tamarack Air, Ltd.*, 298 P.3d 875, 878 (Alaska 2013)).

[5]     *Id.* (quoting *State, Div. of Elections v. Green Party of Alaska*, 118 P.3d 1054, 1059 (Alaska 2005)).

## IV.   DISCUSSION

Kisling contends that the superior court erred by applying the apportionment-of-fault percentages pursuant to AS 09.17.080 before deciding whether the damages cap of AS 09.17.010(b) should apply.  But we agree with the court's analysis and its conclusion that application of the damages caps comes *after* fault is apportioned; the caps apply only to the amount for which the defendant would otherwise be responsible.

### A.   The Statutory Language Does Not Command A Particular Result.

Our first task is to interpret the relevant statutes.  "When interpreting a statute, we consider its language, its purpose, and its legislative history, in an attempt to give effect to the legislature's intent, with due regard for the meaning the statutory language conveys to others."[6]  We start "with the text and its plain meaning, and we use a 'sliding-scale approach' to interpret the language";[7] in other words, "the plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be."[8]  Even when using this sliding scale, "[b]asic  principles of statutory construction 'militate against interpreting a statute in a manner that renders other provisions meaningless.'  Contradictions should be harmonized."[9]  And because

---

[6]      *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 992 (Alaska 2019) (quoting *Alyeska Pipeline Serv. Co. v. DeShong*, 77 P.3d 1227, 1234 (Alaska 2003)).

[7]      *Id.* (quoting *Ward v. State, Dep't of Pub. Safety*, 288 P.3d 94, 98 (Alaska 2012)).

[8]      *Id.* (alteration omitted) (quoting *State v. Fyfe*, 370 P.3d 1092, 1095 (Alaska 2016)).

[9]      *Rollins v. State, Dep't of Revenue, Alcoholic Beverage Control Bd.*, 991 P.2d 202, 208 (Alaska 1999) (footnote omitted) (first quoting *M.R.S. v. State*, 897 P.2d 63, 66 (Alaska 1995); and then citing *In re E.A.O. v. State*, 816 P.2d 1352, 1357 (Alaska 1991)).

AS 09.17.010 "is in derogation of the common law, we must construe it narrowly so as to effect the least possible change in the common law."[10]

Kisling argues that AS 09.17.010(b) unambiguously requires that Grosz's recovery be limited to 25% of the $400,000 damages cap. He focuses on the statutory phrase "damages awarded by a court or a jury" and argues that the phrase clearly shows the legislature's intent that the cap be applied to the jury's entire verdict, whatever it is, before that award is apportioned post-trial by percentages of fault or is otherwise reduced to judgment. But such an intent is not clear to us from the statutory language; another interpretation seems just as feasible if not more so.

In accordance with AS 09.17.080(a)[11] and as reflected in Alaska's Civil Pattern Jury Instructions,[12] the jury in this case was not asked to "award damages" but rather to answer specific questions posed by the special verdict form. One question asked for "the total damages, if any, to the plaintiff that were caused by the negligence of the defendant and the plaintiff"; the jury answered "$1.2 million." But the jury did not purport to "award" that amount.[13] Instead, in answer to the next question it went on to allocate responsibility for those damages 75/25 between Grosz and Kisling. And

---

[10]   *C.J. v. State, Dep't of Corr.*, 151 P.3d 373, 383 & n.52 (Alaska 2006) (citing *Univ. of Alaska v. Shanti*, 835 P.2d 1225, 1228 n.5 (Alaska 1992)); *see also Common Law*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "common law" as "[t]he body of law derived from judicial decisions, rather than from statutes or constitutions").

[11]   The statute provides that "[i]n all actions involving fault of more than one person, . . . the court . . . shall instruct the jury to answer special interrogatories . . . indicating (1) the amount of damages each claimant would be entitled to recover if contributory fault is disregarded; and (2) the percentage of the total fault that is allocated to each claimant [and] defendant."

[12]   *See* Alaska Pattern Jury Instructions – Civ. 3.21A, 3.21B, 3.21C.

[13]   Kisling's argument on this point would require us to conclude that the jury "awarded" $300,000 to Grosz and "awarded" the remaining $900,000 to Kisling. This strikes us as an unnecessarily tortured reading.

that marked the end of the jury's task. Pursuant to AS 09.17.080(c), calculation of the "award" was left to post-judgment motions and court order.[14]

We thus disagree with Kisling's contention that the relevant statutes unambiguously require the court to apply the damages caps before apportioning fault, as the statutes may be read as supporting the opposite sequence. For what clarification they may give, we next "look to the purpose of the legislation and the legislative history for indications of legislative intent."[15]

## B. Legislative History, Reason, And Precedent Support Apportioning Fault Before Applying Damages Caps.

Former AS 09.17.010, enacted in 1986, imposed a cap of $500,000 on noneconomic damages,[16] but there was no cap on damages "for disfigurement or severe physical impairment" until 1997,[17] when the legislature amended AS 09.17.010.[18] We considered the constitutionality of the two damages caps in *Evans ex rel. Kutch v.*

---

[14]     *See* AS 09.17.080(c) ("The court shall determine *the award of damages to each claimant* in accordance with the findings and enter judgment against each party liable." (emphasis added)).

[15]     *Murphy v. Fairbanks N. Star Borough*, 494 P.3d 556, 566 (Alaska 2021) (quoting *Mun. of Anchorage v. Adamson*, 301 P.3d 569, 576-77 (Alaska 2013)).

[16]     Former AS 09.17.010(b) (1986) ("The amount of damages awarded by a court or jury under (a) of this section may not exceed $500,000 for each claim based on a separate incident or injury.").

[17]     *Compare* former AS 09.17.010(c) (1986) ("The limit under [former AS 09.17.010(b) (1986)] of this section does not apply to damages for disfigurement or severe physical impairment."), *with* AS 09.17.010(c) ("In an action for personal injury, the damages awarded by a court or jury that are described under (b) of this section may not exceed $1,000,000 or the person's life expectancy in years multiplied by $25,000, whichever is greater, when the damages are awarded for severe permanent physical impairment or severe disfigurement.").

[18]     *See* ch. 26, § 9, SLA 1997.

*State.*[19]  We recognized the "goals underlying the damages caps, as well as the rest of chapter 26, SLA 1997," as including the following:

> to (1) discourage frivolous litigation and decrease the costs of litigation; (2) stop "excessive" punitive damages awards in order to foster a "positive" business environment; (3) control the increase of liability insurance rates; (4) encourage "self-reliance and independence by underscoring the need for personal responsibility"; and (5) reduce the cost of malpractice insurance for professionals.[20]

Kisling leans heavily on a general legislative intent to reduce damages awards across the board, citing our statement in *C.J. v. State, Department of Corrections* that "the legislature appears to have viewed large noneconomic damage awards as susceptible to over-estimates of the dollar value of a victim's noneconomic loss."[21]  He aptly acknowledges that the "legislature expressed a limitation on the plaintiff's recovery for an injury" and that "[e]xcessive damage awards increased insurance premiums and the cap was intended to reduce insurance premiums."  He contends that the legislature was particularly concerned about "predictability, which is to say, a limitation on what is essentially unlimited, mainly[] non-economic damages."  Grosz agrees that "[t]he legislative history describes an intent to reduce insurance rates," but he argues that this intent "does not support [a] broad interpretation to further reduce a defendant's liability to amounts significantly lower than the stated caps," as would happen in his case under Kisling's interpretation.

We agree that the legislature intended to limit a defendant's exposure and thus a plaintiff's *recovery*.  But we also agree with Grosz on the application of this limitation; namely, that the statutory text and the legislative history do not show an

---

[19]  56 P.3d 1046, 1049-57 (Alaska 2002) (plurality opinion).

[20]  *Id.* at 1053 (footnotes omitted) (quoting ch. 26, § 1, SLA 1997).

[21]  151 P.3d 373, 381 (Alaska 2006).

intent to require reductions *below* the statutory cap. The legislative goals of predictability and reining in "unlimited . . . non-economic damages" are served when a defendant's exposure, and a plaintiff's recovery, are capped at the statutory amounts.

Nor do we see any indication that the legislature intended to supplant fact finders by taking on the task of valuing personal injuries; capping damages is a more straightforward legislative exercise than placing a value on lost limbs and broken bones, which the legislature presumably left to the judicial process. The legislature sought to accomplish its tort reform goals "without diminishing the protection of innocent Alaskans' rights to reasonable, but not excessive, compensation for tortious injuries caused by others."[22] For these reasons — and because there is no statutory language or clear legislative intent to the contrary — we construe AS 09.17.010 to be a limitation on an injured plaintiff's *recovery*, not an attempt to place a dollar value on personal injuries that would require further reduction of a damages award that is already below the cap.[23]

This follows from our reasoning in *Evans*. In that case we considered a number of constitutional challenges to the 1997 tort reform legislation, including whether the damages caps in AS 09.17.010 violated the right to civil trial by jury found in both the Alaska and federal constitutions.[24] In concluding that the caps did not

---

[22]    Ch. 26, § 1(1), SLA 1997.

[23]    *See* ch. 26, § 1(1)-(11), SLA 1997 (noting repeatedly that "it is the intent of this legislature" to provide "reasonable, but not excessive, compensation" for those harmed by tortfeasors, but making no mention of valuing such harm).

[24]    56 P.3d at 1050-51; Alaska Const. art. I, § 16 ("In civil cases where the amount in controversy exceeds two hundred fifty dollars, the right of trial by a jury of twelve is preserved to the same extent as it existed at common law."); U.S. Const. amend. VII ("In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.").

violate this constitutional right — the right to have a jury determine the extent of harm caused by another's tortious conduct — our plurality opinion reasoned that the legislature's "decision to place a cap on damages awarded is a policy choice and not a re-examination of the factual question of damages determined by the jury."[25] And in *L.D.G., Inc. v. Brown*, a unanimous court approved *Evans*'s reasoning, explaining that "[a] damages cap does not intrude on the jury's fact-finding function because the cap represents a policy decision that is applied *after* the jury's determination."[26] A cap "setting a limit on allowable damages does not destroy the jury's role in awarding damages; it merely limits it."[27] The fact finder "must still make a determination of the amount of damages to be awarded, and the damages cap is applied *only in those cases where the jury has made a determination that the damages should be higher than the cap*."[28]

This is not one of those cases. Under the court's award of damages, Kisling is liable for, and Grosz will recover, $300,000 in damages (25% of $1.2 million). Because this is less than the $400,000 cap, Kisling's exposure (and Grosz's recovery) need not be further reduced.[29] This is the result that best accommodates both the apparent legislative purpose and the constitutional right to have a jury decide as a factual matter the amount it would take to make the plaintiff whole.

Kisling posits several examples of situations in which he contends that this sequencing — first allocating fault, then applying damages caps only if necessary — will result in inequities. In his first example, there are one plaintiff and three

---

[25]     *Evans*, 56 P.3d at 1051.

[26]     211 P.3d 1110, 1131 (Alaska 2009) (emphasis added) (citing *Evans*, 56 P.3d at 1051).

[27]     *Id.*

[28]     *Id.* (emphasis added).

[29]     *See id.*

defendants, a jury verdict of $1.2 million in noneconomic damages (as here), and an allocation of 25% fault to each of the four parties. Kisling contends that if fault is allocated before the statutory damages cap is applied, each of the three defendants is found liable for $300,000 — a sum under the statutory cap — meaning that the plaintiff recovers $900,000, "clearly more than the cap of $400,000." But such a result would be impermissible because it would violate the statutory language: "the damages awarded by a court or a jury . . . for all claims . . . arising out of a single injury or death may not exceed $400,000."[30]

Kisling notes the superior court's answer to his posed hypothetical: "the $900,000 attributed to the defendants would have to be reduced to the $400,000 cap and each defendant's liability portion be based on their percentage of fault: i.e., $133,333.33 for each defendant." Kisling highlights the resulting inequity, in that the three defendants, each 25% at fault, owe only $133,333.33 apiece, whereas as the sole defendant in Grosz's case, also 25% at fault, he owes $300,000.

Kisling posits a second hypothetical in which there is no comparative fault on the part of the plaintiff but two defendants are at fault, one 25% and the other 75%. He asks, "Is there any question [but] that the $1,200,000 verdict must be reduced to the $400,000 damages cap first and then judgment for each of the defendants based on the percentage of fault?" This would mean that the defendant who is 75% at fault would owe $300,000, whereas the defendant who is 25% at fault — like Kisling — would owe only $100,000. Again, a different scenario results in a different judgment amount even though the liable defendant's percentage of fault is the same.

Other courts have grappled with hypothetical cases similar to those Kisling highlights. In *Olson v. Hartwig*, the Minnesota Supreme Court considered a case in which the jury found damages of $65,000 and allocated 40% of the fault to the

---

[30] AS 09.17.010(b).

decedent.[31]   There was a $35,000 statutory cap on wrongful death damages.[32]   The question before the court was whether the decedent's percentage of fault "should be applied to the damages found by the jury ($65,000) or to the maximum recovery permitted under [the wrongful death statute] ($35,000)."[33]   Because Minnesota's comparative fault statute was patterned after Wisconsin's, the court followed Wisconsin case law holding "that the percentage of decedent's negligence should be applied to the damages found by the jury rather than to the maximum permissible damages permitted under its [wrongful death] statute."[34]

The Minnesota court identified what it saw as "[t]he most persuasive argument advanced in favor of applying" the comparative fault percentage against the damages cap "rather than [against] the damages awarded by the jury":   "otherwise a case may arise where even though plaintiff's decedent's negligence was 49 percent responsible for the damages for which plaintiff seeks recovery he could still recover the full amount permitted" under the damages cap statute."[35]   The court acknowledged that "such a situation may occur."[36]   But it reasoned:

> The only answer to this argument is that in many wrongful death cases the actual damages to the next of kin far exceed

---

[31]   180 N.W.2d 870, 871 (Minn. 1970).

[32]   *Id.* (citing Minn. Stat. § 573.02 (1970) (amended 1971)).

[33]   *Id.*

[34]   *Id.* at 872 (citing *Mueller v. Silver Fleet Trucking Co.*, 37 N.W.2d 66, 70-71 (Wis. 1949)).   The Wisconsin legislature later amended its wrongful death act to state that "[d]amages found by a jury in excess of [the statutory damages caps] shall be reduced by the court to such maximum" and then "the aggregate of such maximum amounts shall be diminished" by any comparative negligence. *See id.*   The Minnesota Supreme Court concluded that its own legislature "would have adopted the statute as amended" if it had not intended to follow case law interpreting the earlier statute.  *Id.*

[35]   *Id.* at 873.

[36]   *Id.*

[the] permissible recovery under our statute, and it is more equitable to permit recovery of the full amount permitted under our statute in such a case than to further reduce the amount which the next of kin may recover. In any event, we think the number of such cases that will arise will be minimal, and if some other rule is to be adopted it should be done by the legislature. [37]

A federal district court found this reasoning persuasive when interpreting the Kansas wrongful death statutes:

Under all the circumstances we agree with the view expressed in *Olson*, that it is far more equitable to allow the plaintiff the opportunity to recover the statutory maximum than to further reduce her recovery. The injustice of allowing a plaintiff whose decedent was contributorily negligent to perhaps recover as much as a plaintiff whose decedent was not negligent seems slight, compared with the injustice of further reducing plaintiff's recovery, when her maximum recovery is already far less than her actual damages. [38]

The Kansas Supreme Court quoted the federal court's rationale in reaching the same holding.[39]

Like these courts, we recognize the possibility of inconsistent results. Like them, however, we conclude that any resulting injustice is slight in comparison to the injustice of further reducing a recovery that is already capped at an amount less than the loss actually suffered. And some degree of inconsistency is an inevitable consequence of statutory damages caps. For example, a plaintiff who suffers $2,000,000 in noneconomic damages — as determined by a jury — recovers only a fifth of his loss, whereas a plaintiff who suffers $400,000 in noneconomic damages

---

**37** *Id.*

**38** *Benton v. Union Pac. R.R. Co.*, 430 F. Supp. 1380, 1386 (D. Kan. 1977).

**39** *McCart v. Muir*, 641 P.2d 384, 393-94 (Kan. 1982).

recovers all of it. The application of a flat rule invariably advantages some parties and disadvantages others. As the Minnesota court observed, "if some other rule is to be adopted it should be done by the legislature."[40]

## C. The Consensus Among Other Jurisdictions Is That Allocation Of Fault Principles Apply Before Any Statutory Cap.

Case law from other jurisdictions favors allocating fault first and then deciding whether a damages cap should apply to the plaintiff's resulting recovery; the rationales reflect a similar balancing of the legislative policy choice and respect for the role of the jury.[41] For example, in *Brown v. Crown Equipment Corp.*, the Maine Supreme Judicial Court held that a "jury's finding of comparative negligence should be applied before any statutorily mandated caps on damages are [applied to] the total amount of damages."[42] The court reasoned that if comparative fault percentages are applied "first, and the statutory damage cap . . . is then applied against the specific, reduced amount of damages awarded . . . , the jury's intention will most accurately be reflected, and the statutory cap will be imposed only against that portion of the award that is to be 'capped.' "[43] In *Chang v. State Farm Mutual Automobile Insurance Co.*, the Wisconsin Supreme Court addressed the potential reduction of a statutory maximum award in a wrongful death suit.[44] To support its conclusion that the comparative fault

---

[40]   *Olson*, 180 N.W.2d at 873.

[41]   *See, e.g.*, Edward K. Cheng et al., *Sequencing in Damages*, 74 STAN. L. REV. 353, 364-65 (2022) ("On the matter of damage caps, courts have almost unanimously imposed one sequence: apply comparative fault first, then the damage cap. A few courts have relied on specific textual interpretations to arrive at this conclusion. . . . Yet nearly all courts have also relied on precedent, legislative purpose, and policy arguments because the applicable statutory language is invariably ambiguous on the sequencing question.").

[42]   960 A.2d 1188, 1196 (Me. 2008).

[43]   *Id.* at 1195.

[44]   514 N.W.2d 399, 401-02 (Wis. 1994).

percentages should be applied first, the court reasoned that "[t]he statutory maximum is not a measure of damages, nor a limit upon the amount of damage which may be awarded by the jury; rather it is a limit only on recovery."[45]

In *General Electric Co. v. Niemet*,[46] the Colorado Supreme Court addressed the same sequencing question.[47] Observing that the legislative "intent was to cap the amount of noneconomic damages paid by individual defendants,"[48] the court

---

[45] *Id.* at 405 ("A party-beneficiary is entitled to prove actual damages in any amount. Only total recovery of a class is limited by the statutory maximum. Accordingly, it follows that a party-beneficiary may prove damages in excess of the statutory maximum, suffer a reduction in those damages for contributory negligence . . . and still be entitled to collect up to the statutory maximum, assuming that damages equal to or greater than the statutory maximum remain after reductions have been made for his or her contributory negligence.").

[46] 866 P.2d 1361, 1362 (Colo. 1994) (en banc).

[47] *Id.* at 1362-33 ("In any civil action in which damages for noneconomic loss or injury may be awarded, the total of such damages shall not exceed the sum of two hundred fifty thousand dollars, unless the court finds justification by clear and convincing evidence therefor. In no case shall the amount of such damages exceed five hundred thousand dollars." (quoting Colo. Rev. Stat. § 13-21-102.5(3)(a) (West 1987))); *see also id.* ("(1) In an action brought as a result of a death or an injury to person or property, no defendant shall be liable for an amount greater than that represented by the degree or percentage of the negligence or fault attributable to such defendant that produced the claimed injury, death, damage, or loss. . . . (2) The jury shall return a special verdict, or, in the absence of a jury, the court shall make special findings determining the percentage of negligence or fault attributable to each of the parties and any persons not parties to the action." (quoting Colo. Rev. Stat. § 13-21-111.5(1), (2) (West 1987))).

[48] *Id.* at 1365 (finding that "[t]he intent was to cap the amount of noneconomic damages paid by individual defendants, in order to increase predictability for insurance companies, while at the same time not restricting the recovery of noneconomic damages by seriously injured persons more than was necessary to accomplish the goal of insurance predictability").

determined that "a trial court should apportion pro rata liability among the defendants and plaintiff *before* it applies the statutory cap."[49] This is the prevailing view.[50]

---

[49] *Id.* at 1367 (emphasis added). While we agree with the Colorado court's holding on the timing sequence, a difference in Alaska law is that the $400,000 cap is a limit on damages awarded "arising out of a single injury or death," regardless of the number of claimants or defendants. *Compare* AS 09.17.010(b), *and e.g., L.D.G., Inc. v. Brown*, 211 P.3d 1110, 1136 (Alaska 2009) (concluding that "a single damages cap calculated under section (b) should be applied to the aggregate non-economic damages awarded"), *with General Elec.*, 866 P.2d at 1368 (holding "that the cap . . . applies to the liability share of each defendant in a case, and does not act as a cap on the total amount a plaintiff may recover from several defendants").

[50] *See Collins v. Commonwealth Nat. Res. & Env't Prot. Cabinet*, 10 S.W.3d 122, 127 (Ky. 1999) (concluding that proper procedure is to apply reduction for comparative negligence to total amount of damages and then limit recovery to statutory maximum); *Miller v. LAMMICO*, 973 So. 2d 693, 705 (La. 2008) (noting in medical malpractice cap context that "comparative fault is allocated prior to imposition of the statutory damages cap, [and] is not limited to those instances in which the plaintiff is comparatively at fault"); *Gilmore v. Mo. Dep't of Soc. Servs., Child.'s Div.*, 658 S.W.3d 146, 157 (Mo. App. 2022) (affirming application of comparative fault percentages first and then reduction to maximum recovery allowed by statutory cap); *Connelly v. City of Omaha*, 816 N.W.2d 742, 764-65 (Neb. 2012) ("We agree that a statutory limitation on damages . . . 'applies to cap the total recovery after the reduction of the plaintiff's damages for his or her comparative negligence, rather than applying to the total damages established before the reduction for comparative negligence, since the latter approach would multiply the effect of the damage limitation.' " (quoting 57 AM. JUR. 2D *Municipal, County, School, & State Tort Liability* § 602 (2012))); *Coykendall v. Lima Refin. Co.*, No. L-23-110, 2024 WL 3549216, at *9 (Ohio App. July 26, 2024) ("[W]hether in determining the amount of damages in light of the comparative fault of the plaintiff, other defendants, or other non-defendants, the damage calculation must take into consideration the total jury award before the application of any statutory caps."); *Monypeny v. Kheiv*, No. W2014-00656-COA-R3-CV, 2015 WL 1541333, at *25 (Tenn. App. Apr. 1, 2015) (compiling cases and recognizing that "jurisdictions that have addressed the interaction between a damages cap and principles of comparative fault have almost unanimously held that any reduction or allocation based on comparative fault must be done before applying the statutory cap where a plaintiff's damages are subject to reduction based on his or her comparative fault"); *cf. Davis v.*

Nothing in Alaska's statutes or relevant legislative history requires us to follow a different course. The sequence that respects both the jury's fact-finding role and the legislative policy choice is to first apply principles of comparative fault to determine what the claimant is owed and then decide whether that amount is subject to a statutory damages cap. The superior court was correct to follow that sequence in this case.

## V.  CONCLUSION

We AFFIRM the superior court's judgment.

---

*3M Co.* 633 S.W.3d 922, 923, 928 (Tenn. App. 2020) (concluding that plaintiff's relative fault should be apportioned before application of any statutory caps and that any capped amount should then be apportioned among non-plaintiff parties by percentage of fault).